No. 13-50184

IN THE

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | DC No. 2:10-CR-00923-SJO-5 |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | U.S. District Court for |
| vs. | ) | Central District of California, |
| | ) | Los Angeles |
| JERMAINE HARDIMAN, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

————————————

APPELLANT'S OPENING BRIEF

————————————

ON APPEAL FROM FINAL JUDGMENT AND SENTENCE
IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

HONORABLE S. JAMES OTERO
United States District Judge

David J.P. Kaloyanides SBN 160368
15338 Central Avenue
Chino, CA 91710

Attorney for Defendant-Appellant
Jermaine Hardiman

# Table of Content

Bail Status                                                    1

Jurisdiction                                                   1

Issues Presented                                              1

Statement of the Case                                         3

Statement of Facts                                           4

  A. Charges                                  4

  B. Pretrial Proceedings                     6

  C. Trial                                    6

  D. Post Trial Motions                       12

  E. Sentencing Hearing                       13

Summary of the Argument                                      19

Argument                                                     21

 I. The District Court Lacked Jurisdiction Over Count 1
Of the Indictment Because the Government Failed to Allege
Sufficiently, the Necessary Element of The Existence
of An Enterprise.                                            21


 II. The Court Erroneously Denied Mr. Hardiman's Motion
for Judgment of Acquital, and In the Alternative, New Trial.  32


  A. The Evidence of A Conspiracy To Engage In
A Racketeering Enterprise Was Insufficient To
Sustain the Jury's Guilty Verdict As To
Mr. Hardiman.                                                34

1.   The Evidence Did Not Establish
The Existence of The Enterprise            34

2.   Similarly, The Government's Evidence
Failed to Establish The Nexus Between
Mr. Hardiman's Drug Sales and the
Alleged RICO Conspiracy                    37

B.   The Jury's Special Verdict Finding of the
Quantity of Crack Cocaine Was Not Supported
By The Evidence.                           38

III.   The District Court Made Sentencing Errors
Requiring Remand.                          40

A.   Guideline Enhancement Errors            40

B.   The District Court Sentence of 188 Months
Was Procedurally And Substantively
Unreasonable.                              45

C.   The 10-year Supervised Release Term Exceeded
The Maximum Allowed By Statute.           47

Conclusion                                 48

Certificate of Related Cases                                    49

Certificate of Compliance                                      50

# Table of Authorities

**Federal Cases**

*Boyle v. United States,*

556 U.S. 938, 129 S.Ct. 2237, 173 L.Ed.2d 1265 (2009      *passim*

*Chang v. Chen,*

     80 F.3d 1293 (9th Cir. 1996)      34

*Crest Constr. II, Inc. v. Doe,*

     660 F.3d 346 (8th Cir. 2011)      31

*Echavarria-Olarte v. Reno,*

     35 F.3d 395 (9th Cir. 1994)      22

*Jackson v. Virginia,*

443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)      32

*Odom v. Microsoft Corp.,*

     486 F.3d 541 (9th Cir. 2007)      24, 30, 31

*Roberts v. United States,*

445 U.S. 552, 100 S.Ct. 1358, 63 L.Ed.2d 622  (1980)      40

*Russell v. United States,*

369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962)      22

*Simon v. Value Behavioral Health, Inc.,*

     208 F.3d 1073 (9th Cir. 2000)      34

*United States v. Alvarado-Martinez,*

     556 F.3d 732  (9th Cir. 2009)      40

*United States v. Ameline,*

    409 F.3d 1073 (9th Cir. 2005)        40

*United States v. Amezcua-Vasquez,*

    567 F.3d 1050 (9th Cir. 2009)        46

*United States v. Bonilla-Montenegro,*

    331 F.3d 1047 (9th Cir. 2003)        40

*United States v. Brooks,*

    508 F.3d 1205 (9th Cir. 2007)        21

*United States v. Cantrell,*

    433 F.3d 1269 (9th Cir. 2006)        41

*United States v. Carty,*

    520 F.3d 984 (9th Cir. 2008)        45

*United States v. Corona-Verbera,*

    509 F.3d 1104 (9th Cir. 2007)        33

*United States v. Crowe,*

    563 F.3d 969 (9th Cir. 2009)        46

*United States v. Du Bo,*

    186 F.3d 1177 (9th Cir. 1999)        22

*United States v. Espinoza-Morales,*

    621 F.3d 1141 (9th Cir. 2010)        48

*United States v. Fernandez,*

    388 F.3d 1199 (9th Cir. 2004)        34

*United States v. Harris,*

    695 F.3d 1125 (10th Cir. 2012)        30

*United States v. Hosseini,*

    679 F.3d 544 (7th Cir., 2012)          30

*United States v. Jordan,*

    256 F.3d 922 (9th Cir. 2001)          40

*United States v. Kimbrew,*

    406 F.3d 1149 (9th Cir. 2005)          40

*United States v. Laurienti,*

    611 F.3d 530 (9th Cir. 2010)          45

*United States v. Matthews,*

    278 F.3d 880 (9th Cir. 2002)          48

*United States v. Nevils,*

    598 F.3d 1158 (9th Cir. 2010)          33

*United States v. Overton,*

    573 F.3d 679 (9th Cir. 2009)          33

*United States v. Paul,*

    561 F.3d 970 (9th Cir. 2009)          46

*United States v. Pernillo-Fuentes,*

    252 F.3d 1030 (9th Cir. 2001)          22

*United States v. Ramirez,*

    324 F.3d 1225 (11th Cir. 2003)          21

*United States v. Rocha,*

    598 F.3d 1144 (9th Cir. 2010)          33

*United States v. Ruiz,*

    462 F.3d 1082 (9th Cir. 2006)          32

*United States v. Scheele*,

    231 F.3d 492 (9th Cir. 2000)                           42

*United States v. Shelter*,

    665 F.3d 1150 (9th Cir. 2011)                        33

*United States v. Staten*,

    466 F.3d 708 (9th Cir. 2006)                         42

*United States v. Terry*,

    911 F.2d 272 (9th Cir. 1990)                         33

*United States v. Turkette*,

452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981)    25, 27, 29, 30, 34

*United States v. Valensia*,

    222 F.3d 1173 (9th Cir. 2000)                       42

*United States v. Yacoubian*,

    24 F.3d 1 (9th Cir. 1994).                          21

*United States v. Zolp*,

    479 F.3d 715 (9th Cir. 2007)                      40, 41

## Federal Statutes and Rules

| | |
|---|---|
| 18 U.S.C. § 1291 | 1 |
| 18 U.S.C. § 1961 | 23, 24 |
| 18 U.S.C. § 1962(c) | 31, 34 |
| 18 U.S.C. § 1962(d) | 1, 13, 34 |
| 18 U.S.C. § 3553(a) | *passim* |
| 18 U.S.C. § 3583 | 3, 47 |
| 21 U.S.C. § 841 | 2, 3, 13, 15, 21, 47 |
| 21 U.S.C. § 846 | 2, 13, 15 |
| 21 U.S.C. § 860 | 4 |
| Federal Rule Criminal Procedure 12 | 21 |

## Sentencing Guidelines

| | |
|---|---|
| U.S.S.G. § 1B1.1 | 43 |
| U.S.S.G. § 2A1.3(a) | 47 |
| U.S.S.G. § 2A4.1(a) | 47 |
| U.S.S.G. § 2B1.3 | 43 |
| U.S.S.G. § 2D1.1 | 13, 17 |
| U.S.S.G. § 2E1.1 | 13 |
| U.S.S.G. § 2G2.1(a) | 47 |
| U.S.S.G. § 3B1.1 | 17 |

# BAIL STATUS

Defendant-Appellant Jermaine Hardiman, is currently in the custody of the United States Bureau of Prisons serving the 188-month sentence imposed by the district court in 2:10-00923-SJO-5. According to the Bureau of Prisons website, Mr. Hardiman's projected release date is June 12, 2024.

# JURISDICTION

On April 8, 2013, appellant was sentenced to a 188-month prison sentence to be followed by a 10-year term of supervised release following his trial in the district court. The district court entered its final judgment on April 25, 2013. (ER Vol. I, 2).[1]

Mr. Hardiman filed a notice of appeal from his conviction and sentence timely on April 22, 2013. (ER Vol. I, 2).  This Court has jurisdiction under 18 U.S.C. § 1291.

# ISSUES PRESENTED

This appeal presents seven issues, four relating to the trial, and three relating to sentencing.

1. The district court lacked jurisdiction over Count 1 of the Indictment, charging Mr. Hardiman with a violation of 18 U.S.C. § 1962(d), conspiracy to

---

[1] "ER" refers to the Appellant's Excerpts of Record. "CR" refers to the Clerk's Record and is followed by the district court docket number.

engage in racketeering activites, in so far as the government failed to sufficiently allege the "enterprise" element for that charge and, accordingly, the district court should have granted Mr. Hardiman's motion to dismiss Count 1.

2. The evidence at trial was insufficient to support the jury verdict that Mr. Hardiman had conspired to engage in racketeering activities as charged in the Indictment.

3. The evidence at trial was insufficient to support the jury verdict that Mr. Hardiman entered an agreement with members of the Pueblo Bishop Bloods gang to possess with the intent to distribute controlled substances as charged in Count 5 of the Indictment (in violation of 21 U.S.C. § 846 and § 841(a)(1)) rather than with non-gang members as part of a separate and distinct uncharged conspiracy.

4. The government's evidence at trial was insufficient to support the jury's special verdict finding that Mr. Hardiman conspired to possess with intent to distribute and actually distributed at least 28 grams of cocaine base.

As to Mr. Hardiman's sentence:

5. The sentence imposed was procedurally unreasonable because the district court incorrectly calculated the advisory Guideline offense level by using an estimation of both the quantity and type of drug attributable to Mr. Hardiman and by failing to give sufficient weight to the § 3553(a) factors.

6. The sentence was substantively unreasonable because it gave improper weight to several § 3553(a) factors.

7. The imposition of a 10-year term of supervised release exceeds the maximum statutory term of 5-years under 21 U.S.C. § 841(a)(1) & (b)(1)(B) and 18 U.S.C. §3583(b)(1).

## STATEMENT OF THE CASE

Mr. Hardiman was charged in three counts of a 46-count Indictment: conspiracy to engage in racketeering, conspiracy to possess with the intent to distribute controlled substances (namely cocaine hydrochloride, cocaine base, heroine, and marijuana), and distribution and manufacture of controlled substances near schools, playgrounds, and public housing facilities.

Mr. Hardiman raised several issues by pretrial motion. Of relevance to this appeal was his Motion to Dismiss Count 1 of Indictment for lack of jurisdiction filed April 2, 2012. (CR 1098).

Mr. Hardiman went to trial on June 5, 2012. At the close of the government's evidence, Mr. Hardiman filed a Motion for Acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. (CR 1430). The district court took the motion under submission, and Mr. Hardiman put on a defense. Following the close of evidence but prior to closing argument, the district court denied Mr. Hardiman's Rule 29 motion. (CR 1453).

Trial lasted a total of 21 days, at which point the jury returned a guilty verdict against Mr. Hardiman on all three counts. The jury also returned a special finding verdict as to the drug conspiracy count finding Mr. Hardiman responsible for at least 28 grams but less than 280 grams of cocaine base. (ER Vol. I, 50).

3

Following the verdict, the district court granted Mr. Hardiman's request for an extension of time in which to bring post trial motions. Mr. Hardiman renewed his Motion for Judgement of Acquittal or in the Alternative a New trial on August 20, 2012. (CR 1592). On October 15, 2012, the district court denied the motion. (CR 1766).

Mr. Hardiman's sentencing hearing took place on April 8, 2013. The district court imposed a sentence of 188 months followed by a 10-year term of supervised release. (ER Vol. I, 2).

## STATEMENT OF FACTS

### A.    Charges

On August 18, 2010, the government charged approximately 41 defendants in a 46 count Indictment alleging violations of 18 U.S.C. § 1962(d), conspiracy to engage in Racketeering Activity, 18 U.S.C. § 1959, Violent Crimes in Aid of Racketeering, 21 U.S.C. § 846, Conspiracy to Distribute Cocaine, Cocaine Base, Heroin, and Marijuana, 18 U.S.C. § 924(c)(1), Use of a Firearm in Furtherance of a Crime of Violence and a Drug Trafficking Crime, 21 U.S.C. § 860, Distribution and Manufacturing of Narcotics in and Near Schools, Playgrounds, and Public Housing Facilities, 21 U.S.C. § 856(a)(1), Maintaining a Drug-Involved Premises, 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), Distribution and Possession with Intent to Distribute Heroin, Cocaine and Cocaine Base. The charges alleged that members of the Pueblo Bishop

Bloods gang conducted a criminal enterprise and used force, violence and threats of force, as well as drug trafficking activities to further the purposes of the gang.

Mr. Hardiman was charged in three of the forty-six counts. He was charged with conspiracy to engage in racketeering activity (Count 1), conspiracy to distribute cocaine, cocaine base in the form of crack cocaine, and heroin (Count 5), and distribution and manufacture of narcotics in and near schools, playgrounds, and public housing facilities (Count 12). (ER Vol.. I, 8-9, 36, and 44).[2]

The allegations arose out of the activities of members of the Pueblo Bishop Bloods gang ("PBB"), which consisted of residents of the Pueblo del Rio Housing Project in Los Angeles. According to the Indictment, the PBB gang engaged in "conspiracy to traffic in narcotics and controlled substances, murder, conspiracy to commit murder, robbery, extortion, and witness intimidation." (ER Vol. I, 9). The indictment alleged that the PBB gang constituted an "association-in-fact" racketeering enterprise. (Id.)

Mr. Hardiman was alleged to have been a leader of the younger members of the PBB, engaging in drug trafficking, organizing robbery crews, and providing weapons to the gang in furtherance of the racketeering conspiracy. (ER Vol. I, 18).

On May 25, 2011, the government filed a First Superseding Indictment. On May 2, 2012, one month prior to trial, the government filed a Second Superseding

---

[2] References are to the Second Superseding Indictment. The numbering of the counts and the pagination of changed with each indictment, but the substance of the charges against Mr. Hardiman remained consistent.

Indctment. The two superseding indictments alleged additional conduct and overt acts against Mr. Hardiman. However, no substantive charges were added.

## B.    Pretrial Proceedings

Mr. Hardiman filed several pretrial motions. Of relevance here was his Motion to Dismiss Count 1 for lack of jurisdiction. Mr. Hardiman argued below that the government had failed to allege sufficiently the "enterprise" element of the associated-in-fact enterprise of the RICO conspiracy. (CR 1098). Without proper allegations relating to the "enterprise" element, Mr. Hardiman argued that the district court lacked jurisdiction over Count 1.

While the district court heard several of Mr. Hardiman's pretrial motions, including the Motion to Dismiss, on April 26, 2012, the Minutes of the Status conference and Motions Hearing does not reflect whether the district court actually ruled on Mr. Hardiman's motion. (ER Vol.. I, 48).

## C.    Trial

Trial began June 5, 2012. In all, six defendants went to trial, but the district court severed the trial so that only three-defendants were tried together in one setting. Mr. Hardiman went to trial with co-defendants Gary White and Anthony Gabourel. (CR 1397). Mr. Hardiman was tried with two co-defendants, Gary White and Anthony Gabourel.

6

The government's evidence consisted in large part of confidential informants and cooperating witnesses ("CWs"). The government also presented evidence of surveillance video recorded by various CWs.

Trial lasted 17 days, and the jury deliberated for 4 days. On July 16, 2012, the jury returned guilty verdicts against Mr. Hardiman on all three counts. On Count 5, the drug trafficking conspiracy charge, the jury returned a special verdict finding that the conspiracy involved the distribution of less than 500 grams of cocaine, at least 28 grams but less than 280 grams of cocaine base in the form of crack cocaine, and less than 50 grams of heroin. At trial, Mr. Hardiman essentially conceded Count 12.

The government's evidence at trial portrayed the Pueblo Biship Bloods as a loose group of individuals consisting of sub-gangs loyal only to their sub-group. The evidence adduced at trial portrayed only the organization and activities of the specific 54th street sub-gang. Three of the government's cooperating witnesses (Payne, J.K. Gray, and Arthur Maiden along with witness Marquis Edwards) were all part of the 54th Street sub-gang. This was the violent "shooting" sub-gang in the Pueblo del Rio Projects. (ER Vol.. I 60-67, RT 6/13/12, 42:22-43:13). These witnesses all testified about their activities, their own internal rules, their own membership requirements. Yet their testimony was often internally inconsistent and contradicted by one another.

Payne testified that "shootings" were for the benefit and on behalf of the gang, meaning the PBB. (ER Vol. I 60-65, RT 6/13/12, 37:22-38:10). However, he also admitted that he was never ordered nor instructed to shoot anyone or commit any

robberies on behalf of the PBB gang. He admitted that he chose to do this on his own. (ER Vol. I 68-74, RT 6/13/12 140:23-141:16; 145:20-146:5; 147:21-149:2). Arthur Maiden testified that no one encouraged or ordered him to do anything. He simply engaged in violence because he believed it would help his reputation because other would learn about what he had done. (ER Vol. II 79-80, RT 6/14/12 177:17-178:8). However, he also admitted that he never received any special recognition or reward from the PBB gang for the shootings in which he was involved. (ER Vol. II, 84-85, RT 6/18/12 21:16-22:9).

Finally, Edwards testified that there was no real leadership structure in the gang, everyone did whatever they chose to do for their own benefit. No one instructed others to commit crimes or shoot anyone. "Putting in work" was not a requirement of any of the sub-gangs or the Pueblo Bishop Bloods overall. No one had to pay proceeds to anyone else in the gang. (ER Vol. II, 108-109, RT 7/3/12 43:4-44:24). Most importantly, no evidence was adduced that any structure regarding performing criminal acts or engaging in activities for the benefit of, or even contributing anything to (firearms, money) the Pueblo Bishop Bloods over all.

Edwards also testified that he never saw Mr. Hardiman selling drugs, possess weapons, discuss weapons. (ER Vol. II, 106, RT 7/3/12, 31:1-14). Edwards also testified that the PBB did not have leaders. He testified that Mr. Hardiman never gave orders to him nor did he ever witness Mr. Hardiman order any other PBB members. (ER Vol. II, 105, RT 7/3/12, 9:5-22).

The evidence of Mr. Hardiman's drug sales consisted primarily of the video surveillance from an informant, CW4. The video depicts Mr. Hardiman in several

8

drug transactions with CW4 in the residence of individuals who lived within the Pueblo del Rio housing project but who the government conceded were not members of the Pueblo Bishop Bloods or any sub-gang in the housing project.

Additional evidence of Mr. Hardiman's drug trafficking involved co-defendant Stephen Patterson. The government's evidence, again presented both by Patterson's testimony at trial along with the surveillance video recording made by CW8, demonstrated that Mr. Hardiman was conducting his own drug deals for himself.

The evidence presented involved specific controlled purchase of cocaine base. The testimony was limited to Special Agent Strickland, cooperator Patterson, and forensic chemists Daniel Roesch and Sylvia Tarin. The exhibits the government introduced as attributable to Mr. Hardiman was 15.9 grams (ER Vol. II, 90-91, RT 6/28/12, 64:13-65:5, government Exhibit 125), 5.4 grams (ER Vol. II, 94-95, RT 6/28/12, 166:13-167:10, government Exhibit 138), and 42.6 grams (ER Vol. II, 96-97, RT 6/28/12, 169:6-171:13), government's Exhibit 161).

Agent Strickland testified that Exhibit 161 was retrieved by CW8 during a controlled buy June 4, 2008. (ER Vol. I, 58-59, RT 6/7/12 at 57:9-58:6). Patterson testified that he delivered the cocaine to the confidential informant personally. Mr. Hardiman did not give the informed any.

Q:    Did you bring two ounces of cocaine to give to the informant?

A:    I believe I did.

Q:    Okay. So did you, at this point, give the informant two ounces of cocaine?

A:    Yes.

9

> Q:    Did you see Defendant Hardiman give the informant
>
> anything?
>
> A:    No.

(ER Vol. II, 92, RT 6/28/12, at 103:9-17).

Patterson identified the drugs as "cocaine" not "crack." Then, when the government presented the surveillance video (Exhibit 162) to the jury, the following exchange occurred:

> Q:    Do you recall then seeing the informant gives defendant
>
> Hardiman any money?
>
> A:    No.
>
> Q:    Did Defendant Hardiman tell you that the informant had
>
> given him any money?
>
> A:    Yes.
>
> Q:    What did Defendant Hardiman tell you?
>
> A:    That he got--that he gave him 1,400 already for the drugs.

(ER Vol. II, 92-93, RT 6/28/12, at 103:21-104:4).

Chemist Sylvia Tarin testified that she performed a chemical analysis on Exhibit 161, which was the cocaine recovered from the Patterson transaction. She testified that it was cocaine base in a quantity of 42.6 g. (ER Vol. II, 96, RT 6/28/12, at 169:6-11).

Ms. Tarin testified that she examined Exhibit 161 in May 2012. A different chemist had tested the exhibit August 27, 2008. (ER Vol. II, 101, RT 6/28/12, at 185:8-15). The original chemists analysis showed that the exhibit was cocaine

hydrochloride in which sodium bicarbonate was detected. (ER Vol. II, 97-98, RT 6/28/12, 170:5-171:10). Ms. Tarin explained in more detail how the cocaine hydrochloride converted into cocaine base:

> Q:      Now, if cocaine hydrochloride is -- comes into the presence and contact with cocaine base, over a period of time will there be a chemical reaction?
>
> A:      In this case there was.
>
> Q:      So in this case what happened?
>
> A:      The other chemist had also detected the presence of sodium bicarbonate, and being in the presence of sodium bicarbonate over time it had cleaved off the hydrochloride and created the base form.
>
> Q:      So am I correct that when Mr. Goldberg did his analysis, there was the presence of sodium bicarbonate separate from the cocaine hydrochloride?
>
> A:      No. In the mixture, in the white powder itself -- it was just one big lump of powder -- detected the sodium bicarbonate as well.
>
> Q:      All right. So to be clear, if you have sodium bicarbonate that comes into contact with cocaine hydrochloride, over time the chemical reaction will still occur without the dissolving process and heating that you described.
>
> A:      Yes.

(ER Vol. II, 99-100, RT 6/28/12, 183:19-184:13).

11

Ms. Tarin's test showing Exhibit 161 was entirely cocaine base resulted from the fact that she tested Exhibit 161 four years after it was recovered.  It was this four year time span that resulted in the conversion of cocaine hydrochloride into 42.6 g of cocaine base.

### D.     Post Trial Motions

At the close of the government's case, Mr. Hardiman made a written motion pursuant to Rule 29. The district court continued the argument on the motion until after the defense presented its case. Mr. Hardiman presented a full argument on the insufficiency of the government's evidence to meet its burden of proving beyond a reasonable doubt the elements of Count 1 (the racketeering conspiracy) and Count 5 (the drug trafficking conspiracy). The district court denied Mr. Hardiman's motion on July 9, 2012. (CR 1453).

On July 16, after the jury returned its verdict, Mr. Hardiman made an oral motion for an extension of time in which to bring post trial motions. The district court granted the extension and set the hearing for September 10, 2012. On August 20, 2012, Mr. Hardiman filed his renewed Motion for Judgment of Acquittal, and in the alternative, New Trial. On the stipulation of the parties, the hearing on the post trial motions was continued until October 15, 2012. The government filed its opposition to Mr. Hardiman's motion on September 24, and Mr. Hardiman filed a reply on October 1, 2012. Mr. Hardiman's Motion was based on the argument that the evidence was insufficient to support the jury's verdict.

On October 15, 2012, the district court denied Mr. Hardiman's Motion for Judgment of Acquittal and New Trial. (ER Vol. II, 106).

### E.    Sentencing Hearing

The Presentence Report and Recommendation ("PSR") calculated the advisory Guideline offense level to be 28 and Mr. Hardiman's Criminal History Category at III. The PSR calculated the base offense level at 26, based on § 2E1.1(a)(1) and § 2D1.1(c)(7) of the advisory Guidelines which provides that for a violation of 18 U.S.C. § 1962(d) (Count 1), the base offense is the greater of 19 or the offense level applicable to the underlying racketeering activities. Because one of the racketeering activities involved in the case was the violation of 21 U.S.C. § 846 and § 841(a)(1), the guideline offense level was premised on amount of controlled substance at issue (in this case cocaine base). The PSR calculated the total drug quantity marijuana equivalent to be 169.736 kilograms, with a corresponding offense level of 26. (SER 1).[3]

The PSR found that Mr. Hardiman was a leader of the "YGs" and encouraged some, albeit an unknown number, to engage in armed robberies of various businesses near the Pueblo del Rio Housing Project. Because the extent of his "leadership" role could not be determined, the PSR applied the rule of lenity and imposed a two-level increase in offense level. (*Id.*)

Accordingly, the PSR calculated the total adjusted offense level at 28. (*Id.*)

---

[3] "SER" refers to Sealed Excerpts of Record.

13

The PSR calculated, and the parties did not dispute, that Mr. Hardiman's Criminal History Category was III based on five criminal history points. The PSR did not find any basis for a sentence outside the advisory Guidelines and found no basis for a variance from the advisory Guideline sentencing range. Accordingly, the PSR recommended a sentence range within the advisory Guidelines of 97 to 121 months. (SER 1).

In stark contrast to the PSR, the government argued that Mr. Hardiman should be sentence to 262 months followed by a period of supervised release for 10 years. The government argued that Mr. Hardiman's base offense level was 32, based on distribution of at least 280 grams of cocaine base, that there should be an increase of two-levels for possession of a dangerous weapon, an increase of three-levels for Mr. Hardiman's role as a manager or supervisor of five or more participants. According to the government, the total adjusted offense level was 37. The government's sentencing position was primarily based on the advisory Guidelines. At Criminal History Category III, the advisory Guideline Range was 262-327 months. (ER Vol. III, 136).

The principle argument on which the government based its argument for the base offense level was that Mr. Hardiman should be responsible for the extensive drug trafficking that took place with the Pueblo del Rio Housing Project. The government referred to the evidence at trial regarding Mr. Hardiman's drug sales facilitated by a woman named Patti.

> An example of this comes from a woman named "Patti," who helped
> facilitate a cocaine sale for defendant on February 22, 2008. In a call

14

> with the CI in Exhibit 103, Patti explained "his name's Jermaine.
> We cook for my little son-in-law," suggesting that Patti was involved
> in a continuous drug-dealing capacity with defendant.

(ER Vol. III, 144).

Mr. Hardiman argued for a sentence of 60 months to be followed by a 5-year term of supervised release based on the only count of conviction that implicated a mandatory minimum: Count 5, a violation of 21 U.S.C. § 846 and § 841(a)(1), conspiracy to possess with intent to distribute and actual distribution of at least 28 grams of cocaine base. This argument was based on the jury's special verdict finding that Mr. Hardiman possessed with intent to distribute at least 28 grams but less than 280 grams of cocaine base. Mr. Hardiman argued that under the parsimony provision of 18 U.S.C. § 3553(a), the mandatory minimum of 60 months constituted the least sentence that was sufficient but not greater than necessary to achieve the goals of sentencing. (ER Vol. III, 160).

Mr. Hardiman made 15 objections to the PSR. (*Id.* at 166-170). Mr. Hardiman argued that the evidence did not show by a preponderance of the evidence that he was a leader of any sub-group of the gang. Mr. Hardiman pointed out that through counsel at trial, he admitted that he sold drugs but that this was not part of the charged conspiracies, and the evidence did not demonstrate that he ever acted to protect "gang territory." Mr. Hardiman argued that the evidence did not demonstrate by a preponderance of the evidence that he had committed the 2004 Bank of the West robbery nor was there a sufficient showing that he organized robbery crews on behalf of the gang. (*Id.*)

15

Mr. Hardiman also argued for a two-level reduction in offense level for acceptance of responsibility based on the fact that he admitted specific conduct and that he had tried to negotiate a plea deal based on his own conduct. (*Id.*)

Mr. Hardiman argued that the total adjusted offense level should be 24 based on the jury's finding of at least 28 grams of cocaine base and consideration for partial acceptance of responsibility. (*Id.*)

Mr. Hardiman also objected to the inclusion of his 1998 conviction in his criminal history calculation to the extent that this conviction also was the initial predicate racketeering act in which Mr. Hardiman engaged and was, accordingly, used as part of the government's argument of relevant conduct for purposes of enhancing Mr. Hardiman's sentence.

In arguing for the 60-month sentence, Mr. Hardiman provided the district court with an analysis of the sentences imposed on the co-defendants in the case as of the date of the submission of his sentencing position. Of note was the fact that the senior members, leaders and most violent actors in the gang had received sentences far less than what the government sought for Mr. Hardiman, and even less than what the district court ultimately imposed. (ER Vol. III, 163-64, 175-76).

Of particular note is the fact that the government argued for a sentence of only 180 months for the leader of the Pueblo Bishop gang, Gary White. The district court ultimately only imposed a sentence of 168 months for Mr. White–20 months lower than for Mr. Hardiman. (ER Vol. III, 176).

The district court imposed a sentence of 188 months "which is the low end of the guideline range" (ER Vol. IV, 223, RT 4/8/13 at 46:21-22) to be followed by a

term of supervised release of 10 years based on the government's representation that Count 5 (21 U.S.C. § 846 & § 841(a)(1) & (b)(1)(B)) allowed for such. (*Id.* at 224).

The district court calculated the guideline offense level as 34 based on the following:

Base Offense Level: 32 (over 280 grams of cocaine base, § 2D1.1(c)(4)).

Enhancement for leadership role: +2 (§ 3B1.1(c)).

Total Adjusted Offense Level: 34

Criminal History Category: III (based on 5 criminal history points).

The guideline range was calculated to be 188 to 235 months. (ER Vol. IV, 219-223, RT 4/8/13 at 42:16-46:9).

The district court sustained Mr. Hardiman's objection to the two-level enhancement for possession of a dangerous weapon. However, the court calculated the drug quantity as exceeding 280 grams of cocaine base:

> Even though the jury found that you were responsible for more than 28 grams but less than 280, the Government proved–I think–I disagree with the jury. I think the Government proved beyond any reasonable doubt that you were responsible for far more than that.
>
> The Court concludes that you should be held responsible for conspiracy to traffic more than 280 grams of cocaine base based on direct evidence of your involvement and also vicarious liability as articulated by the Government in their brief.

(ER Vol. IV, 219-200, RT 4/8/13 at 42:20-43:4).

17

In its analysis under § 3553(a), the district court focused on specific aspects of Mr. Hardiman's conduct. The district court found that the government's recommended sentence was unjustifiably greater than appropriate under 18 U.S.C. § 3553(a) factors. However, the court also rejected Mr. Hardiman's argument that the mandatory minimum sentence met the parsimony provision of the sentencing statute as sufficient but not greater than necessary. Of significant concern was the evidence of Mr. Hardiman's distribution of weapons and criminal history.

> At the same time, the court is significantly concerned about the weapons possession, the weapons sales, the number of weapons, the type of weapons, your ease at distributing weapons and using weapons and so that has to be taken into consideration and the Court would find that to be an aggravating factor and a factor for proper consideration under 3553. In terms of your criminal history even though it's a Criminal History Category of III, your first offense was at age 15 and your prior convictions, probation, parole violations suggest that you're probably highly likely to re-offend unless a significant term of imprisonment is imposed. That being said, I'm not going to impose the sentence that has been recommended by the Government.

(ER Vol. IV, 222, RT 4/8/13 at 45:12-24).

18

# SUMMARY OF THE ARGUMENT

The government failed to allege a required element of Count 1, the racketeering conspiracy, namely the "enterprise" element. At trial, the evidence was insufficient to support the jury's finding that the government had proven the "enterprise" element for an associated-in-fact conspiracy distinct from the pattern of racketeering in which it engaged. As a separate element of the offense, the government must allege and prove that the "enterprise" was separate and ascertainable apart from the pattern of racketeering. But here, the allegations in the Indictment were overly broad and failed to specify the existence of a distinct entity other than the pattern of racketeering. Accordingly, the district court lacked jurisdiction over Count 1, and Mr. Hardiman's Motion to Dismiss that count should have been granted.

This issue was compounded at trial as the government's evidence failed to prove that the "enterprise" alleged, the entity of the PBB was separate from the racketeering activities in which its members engaged. The evidence presented at trial demonstrated that the PBB was nothing more than a group of individuals committing crimes that, in some cases, constituted racketeering activities. This is insufficient to prove the requisite "enterprise" element and, therefore, the evidence was insufficient to sustain the jury's verdict as to Count 1.

Moreover, the government's evidence of Mr. Hardiman's drug trafficking failed to demonstrate that he had conspired with the PBB as opposed to other non-PBB

members. The evidence demonstrated that he engaged in drug transactions apart from the PBB, that his transactions were for his own benefit and that he had little regard for the PBB gang and its members, just as they had little respect for him. The evidence at most established that Mr. Hardiman had conspired with others in his drug trafficking. The evidence did not demonstrate that he was part of the charged conspiracy.

Furthermore, the evidence did not support the special finding of the jury that Mr. Hardiman was responsible for at least 28 grams of cocaine base. The principle evidence of cocaine base transactions involved the transactions with a confidential informant facilitated by non-PBB members. These amounts, which were recovered by law enforcement, did not amount to 28 grams. The only amount recovered in excess of 28 grams was a June 4, 2008 transaction in which the evidence demonstrated that Mr. Hardiman moved in on a transaction being handled by cooperating witness Stephen Patterson. Patterson himself identified the transaction as a powder transaction, and subsequent chemical analysis also confirmed that the transaction was a powder cocaine transaction in which was detected sodium bicarbonate. At the time the chemist retested the sample for trial, nearly four years later, the sample had chemically converted into cocaine base. But at the time of the transaction, it was powder cocaine. Accordingly, there is no basis on which the jury could have properly found that Mr. Hardiman was responsible for at least 28 grams of cocaine base.

At sentencing, the district court made three sentencing errors. First, the district court relied on speculative estimates for determining the quantity and type of

drug for calculating the guideline offense level. Second, the district court gave too much weight to certain of the § 3553(a) factors over others. Accordingly, the sentence imposed of 188 months was procedurally and substantively unreasonable. Finally, the district court imposed a 10-year term of supervised release which exceeded the statutory maximum of 5-years for an offense under 21 U.S.C. §841(a)(1) & (b)(1)(B).

## ARGUMENT

**I. The District Court Lacked Jurisdiction Over Count 1 Of The Indictment Because The Government Failed To Allege Sufficiently, The Necessary Element Of The Existence Of An Enterprise.**

Mr. Hardiman challenged the district court's jurisdiction on Count 1 based on the failure to allege sufficiently the enterprise element of the RICO conspiracy. As the question of the district court's jurisdiction is a question of law, on appeal, the determination of the district court is reviewed *de novo*. *See United States v. Yacoubian*, 24 F.3d 1, 3 (9th Cir. 1994).

Mr. Hardiman's motion to dismiss was properly raised prior to trial under Federal Rule of Criminal Procedure 12(b)(3). While most motions under Rule 12(b) must be brought prior to trial, "the court may hear a claim that the indictment or information fails to invoke the court's jurisdiction or to state an offense" at any time while the case is pending. *See* FED.R.CR.P. 12(b)(3). However, an attack on the district court's jurisdiction based on a failure to allege sufficiently a necessary element of an offense must be brought before trial. *See United States v. Brooks*, 508 F.3d

21

1205, 1208 (9th Cir. 2007); *see also United States v. Ramirez*, 324 F.3d 1225 (11th Cir.), *cert. denied*, 540 U.S. 881 (2003).

A challenge to the sufficiency of an indictment requires examining whether the indictment properly alleges:

> [T]he elements of the offense intended to be charged, and sufficiently apprises the defendant of what he must be prepared to meet, and secondly, in case any other proceedings are taken against him for a similar offense, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction.

*Russell v. United States*, 369 U.S. 749, 763-64, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962).

When a defendant challenges the sufficiency of an indictment prior to trial, the district court does not construe the allegations in favor of sufficiency. An indictment is construed liberally and presumed valid when the challenge is not timely. *See Echavarria-Olarte v. Reno*, 35 F.3d 395, 397 (9th Cir. 1994). "An indictment's failure to 'recite an essential element of the charged offense is not a minor or technical flaw . . . but a fatal flaw requiring dismissal of the indictment.'" *United States v. Pernillo-Fuentes*, 252 F.3d 1030, 1032 (9th Cir. 2001) (quoting *United States v. Du Bo*, 186 F.3d 1177, 1179 (9th Cir. 1999)).

For federal jurisdiction to exist over Count 1 here, the government was required to allege and prove the existence of the racketeering conspiracy. The threshold element of that offense is the existence of an "enterprise." The indictments alleged that the Pueblo Bishop gang constituted an enterprise as a "union or group of individuals associated in fact."

22

The government alleged that Mr. Hardiman conspiracy to engage in racketeering activity. Yet other than the conclusory allegation that the gang was "an association in fact" as defined by 18 U.S.C. §1961(4), the allegations failed to state with any specificity how the PBB gang was an "enterprise."

The initial Indictment, the First Superseding Indictment, and the Second Superseding Indictment contain the identical allegations concerning the enterprise. The allegations regarding the enterprise element were nothing more than two conclusory statements. After listing all the named defendants in the case, the Indictment states that the defendants were:

> [M]embers and associates of an organization engaged in, among other things, conspiracy to traffic in narcotics and controlled substances, murder, conspiracy to commit murder, attempted murder, robbery, extortion, and witness intimidation.

(ER Vol. I, 9.)

After this general statement, the indictments made the averment that

> The Pueblo Bishops, including its leaders, member and associates, constituted an "enterprise," as defined by Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact. The Puebelo Bishops engaged in, and its activities affected, interstate and foreign commerce. The Pueblo Bishops constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

23

(ER 9).[4]

The indictments alleged the history of the gang, the physical location where most of the members resided or where they engaged in some of their activities. The indictments all alleged a structure for the gang by describing some of the members as leaders, identifying specific sub-gangs or "cliques" and suggesting general rules of conduct for members. The indictments also alleged various types of criminal activity that members committed and various means by which members identified themselves.

An associated-in-fact enterprise requires the government to allege: i) persons associate for the "common purpose of engaging in a course of conduct;" ii) "an ongoing organization, formal or informal;" and iii) that the associates functioned as a "continuing unit." *See Boyle v. United States*, 556 U.S. 938, 129 S.Ct. 2237, 2239, 173 L.Ed.2d 1265 (2009); *Odom v. Microsoft Corp.*, 486 F.3d 541, 552 (9th Cir. 2007) (*en banc*).

The "enterprise" for a RICO conspiracy must have certain characteristics. There need not be any elaborate showing of hierarchy, but the enterprise must have enough organization to make decisions for the group and maintain its own existence long enough to pursue a course of conduct. *See Boyle, supra*, at 2245.

---

[4] 18 U.S.C. §1961(4) provides: "As used in this chapter– "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

In a RICO conspiracy, the government must allege and prove the enterprise element by showing: i) a structure; ii) that is ascertainable; and iii) whose existence is beyond that inherent in the pattern of racketeering. *Id.*

Key to determining the existence of the enterprise is the requirement that the enterprise be distinct from the pattern of racketeering activities themselves. The existence of the pattern of racketeering activities by a group does not establish the existence of the enterprise. *See Id.*, at 2245.

In *United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), the Supreme Court addressed the specific question of whether a wholly criminal organization could constitute a RICO enterprise under the statute or whether only "legitimate" businesses met the definition. The Supreme Court explained clearly that while an "enterprise" as defined under § 1961(4) may be a criminal or illegitimate organization does not mean that "a 'pattern of racketeering activity' is an 'enterprise.'" *Id.* at 583.

The Court continued:

> In order to secure a conviction under RICO, the Government must prove both the existence of an "enterprise" and the connected "pattern of racketeering activity." The enterprise is an entity, for present purposes a group of person associated together for a common purpose of engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute. [Citation omitted]. The former is proved by evidence of an ongoing organization, formal or informal, and by

25

evidence that the various associates function as a continuing unit. The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise. While the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other. The "enterprise" is not the "pattern of racketeering activity"; it is an entity separate and apart from the pattern of activity in which it engages. The existence of an enterprise at all times remains a separate element which must be proved by the Government.

*Id.*

In *Boyle v. United States, supra* 556 U.S. 938, the Supreme Court looked more specifically at the definition of an "association-in-fact enterprise" under RICO and the specific language required in jury instructions on this element. The Court held that such an enterprise required proof of "an ascertainable structure beyond that inherent in the pattern of racketeering activity in which it engaged" but that this statutory language was not required for the jury instructions. *Id.* at 941.

*Boyle* involved a series of thefts, primarily targeting bank-vaults and other cash-laden night-deposit boxes. The crimes also included some bank robberies. *Id.* The Court noted that the crimes were typically conducted by a group of individuals who met beforehand for planning and preparation. Part of this involved assigning specific roles for each participant for the specific theft. The proceeds were generally split amongst the participants. The Court noted:

> The group was loosely and informally organized. It does not appear
> to have had a leader or hierarchy; nor does it appear that the
> participants ever formulated any long-term master plan or
> agreement.

*Id.*

The Court broke down the analysis of the enterprise into three parts: i) whether an association-in-fact enterprise required proof of structure; ii) whether that structure must be "ascertainable"; and iii) whether the "structure" must go "beyond that inherent in the pattern of racketeering activity" in which its members engaged. *Id.* at 945.

The Court answered the first question affirmatively, relying in large part on the common dictionary definition of structure:

> [W]e agree with petitioner that an association-in-fact enterprise must
> have a structure. In the sense relevant here, the term "structure
> means "[t]he way in which parts are arranged or put together to form
> a whole" and "[t]he interrelation or arrangement of parts in a
> complex entity.

*Boyle, supra* at 945-46 (citations omitted).

Relying on the analysis of an association-in-fact enterprise in *Turkette*, ("a group of persons associated together for a common purpose of engaging in a course of conduct." 452 U.S. at 583), the Court held that such an enterprise must contain three structural features: i) purpose; ii) relationship among those associated; and iii) longevity. *Id.* at 946.

27

The Court also held that while the answer to the second question on "ascertainable" was also true, the district court was not required to expressly instruct the jury as to this element.

> Whenever a jury is told that it must find the existence of an element beyond a reasonable doubt, that element must be "ascertainable" or else the jury could not find that it was proved. Therefore, telling the members of the jury that they had to ascertain the existence of an "ascertainable structure" would have been redundant and potentially misleading.

*Boyle, supra* at 947.

As for the third question, whether the structure of the enterprise must go "beyond that inherent in the pattern of racketeering activity," the Court answered the question as a matter of interpretation.

> If the phrase is interpreted to mean that the existence of an enterprise is a separate element that must be proved, it is of course correct. As we explained in *Turkette*, the existence of an enterprise is an element distinct from the pattern of racketeering activity and "proof of one does not necessarily establish the other." [*Turkette*] 452 U.S. at 583, 101 S.Ct.2524.

*Id.* at 947.

However, the Court continued:

> On the other hand, if the phrase is used to mean that the existence of an enterprise may never be inferred from the evidence showing

28

> that persons associated with the enterprise engaged in a pattern of
> racketeering activity, it is incorrect. We recognized in *Turkette* that
> the evidence used to prove the pattern of racketeering activity and
> the evidence establishing an enterprise "may in particular cases
> coalesce." *Ibid.*

*Id.*

Again relying on its earlier decision in *Turkette*, the Court in *Boyle* stated:

> We see no basis in the language of RICO for the structural
> requirements that petitioner asks us to recognize. As we said in
> *Turkette*, an association-in-fact enterprise is simply a continuing unit
> that functions with a common purpose. Such a group need not have
> a hierarchical structure or a "chain of command"; decisions may be
> made on an ad hoc basis and by any number of methods–by majority
> vote, consensus, a show of strength, etc. Members of the group need
> not have fixed roles; different members may perform different roles
> at different times. The group need not have a name, regular
> meetings, dues, established rules and regulations, disciplinary
> procedures, or induction or initiation ceremonies. While the group
> must function as a continuing unit and remain in existence long
> enough to pursue a course of conduct, nothing in RICO exempts an
> enterprise whose associates engage in spurts of activity punctuated by
> periods of quiescence.

*Id.* at 948.

29

Notably absent from the Supreme Court's analysis, however, is the distinction between the association-in-fact enterprise's existence separate and apart from the pattern of racketeering activity. While *Boyle* emphasizes that such an enterprise must be a "continuing unit that functions with a common purpose" that purpose must be something other than to commit the crimes that form the racketeering activity. *Boyle* rejected any requirement of "business-like" features for purposes of alleging and proving the RICO enterprise. Nevertheless, the enterprise alleged must consist of more than simply the criminal acts comprising the racketeering activities themselves.

*Boyle* states that the evidence of the racketeering activity may also provide an inferential basis for the existence of the enterprise. However, these two elements are separate. *See id.*, at 947; *see also United States v. Harris*, 695 F.3d 1125, 1135 (10th Cir. 2012) ("The existence of such an [association-in-fact] enterprise, the Supreme Court held, could *in some cases* be inferred from the very same evidence that showed the pattern of racketeering activity." (emphasis added)). From the express language in *Boyle* and *Turkette*, the purpose of the enterprise (or the object of the RICO conspiracy) cannot be merely to commit the crimes constituting the racketeering activities. *See Turkette, supra*, 452 U.S. at 583 (""While the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other. *The "enterprise" is not the "pattern of racketeering activity"* it is *an entity separate and apart from the pattern of activity in which it engages.*" (emphasis added)); *Odom v. Microsoft Corp.*, 486 F.3d 541, 549 (9th Cir. 2007) (quoting *Turkette*); *see, e.g., United States v. Hosseini*, 679 F.3d 544, 558 (7th Cir., 2012) (defendants operated three

30

auto dealerships with employees through which they laundered drug trafficking proceeds); *see also Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 354-55 (8th Cir. 2011) ("In deciding whether an alleged RICO enterprise has an ascertainable structure distinct from the pattern of racketeering activity, we must 'determine if the enterprise would still exist were the predicate acts removed from the equation.'" (internal citations omitted)).

Without requiring specific allegations and proof that an enterprise is separate and distinct from the pattern of racketeering acts, every series of criminal acts and every conspiracy would fall within the ambit of the RICO statute.[5]

Here, the indictment makes sweeping and conclusory allegations that an enterprise existed and that Mr. Hardiman was part of that enterprise. While proof of the actual existence of the enterprise is not necessary for a violation of a § 1962(c) conspiracy, the government must still alleged an prove that Mr. Hardiman conspired to engage in racketeering through an enterprise that meets the definition of §1961(4).

In this case, the enterprise alleged and the evidence presented demonstrated no separate enterprise distinct from the pattern of racketeering activities themselves. The indictment, as well as the proof at trial, amounts to little more than the allegation that Mr. Hardiman was part of a group of individuals from the Pueblo del Rio housing project who all committed various crimes. The allegations do not

---

[5] While the court in *Odom v. Microsoft*, 486 F.3d 541 (9th Cir.), *cert. denied*, 552 U.S. 985, 128 S.Ct. 464, 169 L.Ed.2d 325 (2007), held that an associated-in-fact enterprise did not require an "ascertainable structure" under RICO, *Boyle* made clear that the enterprise did require ascertainable structure separate and apart from the racketeering activities. *See Boyle, supra*, 556 U.S. at 947.

show facts that any of Mr. Hardiman's own conduct was for the benefit of the enterprise, that his actions were at the direction of the enterprise, and other than the conclusory allegation that he was a leader of the "YGs," that he was involved in the operation or management of the enterprise.

Failing to allege sufficiently the type of enterprise necessary for charging Mr. Hardiman with engaging in a RICO conspiracy, the district court lacked jurisdiction and should have granted Mr. Hardiman's Motion to Dismiss Count 1.


## II. The District Court Erroneously Denied Mr. Hardiman's Motion For Judgment Of Acquittal, And In The Alternative, New Trial

This Court reviews the sufficiency of the evidence to support the jury's verdict against Mr. Hardiman de novo. *See United States v. Ruiz,* 462 F.3d 1082, 1087-1088 (9th Cir. 2006). "The relevant question is whether, after viewing the evidence in th elight most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

The question on a motion for judgment of acquittal is whether the government has presented sufficient evidence upon which the jury's verdict may stand. This requires a two-stage analysis for the district court.

> Evidence is sufficient to support a conviction unless, viewing the
>
> evidence in the light most favorable to sustaining the verdict, no

> rational trier of fact could have found the essential elements of the
> crime beyond a reasonable doubt.

*United States v. Overton*, 573 F.3d 679, 685 (9th Cir. 2009).

The district court must then determine whether based on that evidence any rational juror could have found the essential elements of the crime beyond a reasonable doubt.  *See United States v. Nevils*, 598 F.3d 1158, 1161 (9th Cir. 2010).

> Evidence is insufficient to sustain a conviction when, viewed in the
> light most favorable to the prosecution it is 'so supportive of
> innocence that no rational juror could conclude that the government
> proved its case beyond a reasonable doubt,' or 'where mere
> speculation, rather than reasonable inference, supports the
> government's case.

*United States v. Shelter*, 665 F.3d 1150, 1164 (9th Cir. 2011) (quoting *Nevils, supra*, at 1167).

Challenging the jury's verdict based on a claim of insufficiency of the evidence is a difficult one. *See United States v. Rocha*, 598 F.3d 1144, 1153 (9th Cir. 2010). The court must view all the evidence in a light most favorable to the government and determine "whether the evidence and all reasonable inferences which may be drawn from it . . . sustain the verdict." *United States v. Terry*, 911 F.2d 272, 278 (9th Cir. 1990). All conflicts in the evidence must be resolved in favor of the jury verdict. *United States v. Corona-Verbera*, 509 F.3d 1104, 1117 (9th Cir. 2007).

33

**A. The Evidence Of A Conspiracy To Engage In A Racketeering Enterprise Was Insufficient To Sustain The Jury's Guilty Verdict As To Mr. Hardiman.**

**1. The Evidence Did Not Establish The Existence Of The Enterprise.**

The evidence presented at trial failed to establish that Mr. Hardiman had entered the conspiracy to engage in racketeering through an enterprise. Contemplated or actual existence of a racketeering enterprise is an element of a § 1962(d) charge of conspiracy to violate § 1962(c). *See United States v. Fernandez*, 388 F.3d 1199, 1123 n.13 (9th Cir. 2004). As set forth above, establishing the existence of an associated-in-fact enterprise requires the government to prove: (1) the existence of an ongoing organization, formal or informal; (2) that the ongoing organization has a hierarchical or consensual decision-making structure beyond that inherent in the alleged racketeering activity; and (3) the organization is one in which the various associates function as a continuing unit. *See United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981); *Chang v. Chen*, 80 F.3d 1293, 1297, 1299-1300 (9th Cir. 1996). In order for a group of individuals to qualify as an enterprise, "the [decision-making] structure should provide some mechanism for controlling and directing the affairs of the group on an on-going, rather than an ad hoc, basis." *Chang, supra*, 80 F.3d at 1299 (citation and internal quotation marks omitted); *see also Simon v. Value Behavioral Health, Inc.*, 208 F.3d 1073, 1083 (9th Cir. 2000) ("A group

34

whose members collectively engage in an illegal act, in-and-of-itself, does not constitute and 'enterprise' for the purposes of RICO.").

The government's evidence at trial demonstrated nothing more than the PBB was a loose group of individuals consisting primarily of sub-gangs loyal only to their sub-group. Three of the government's cooperating witnesses all testified that the rules, organization and activities in which they were engaged related primarily to their involvement in the specific 54th street sub-gang. This was the violent "shooting" sub-gang in the Pueblo del Rio Projects. (ER Vol. I, 66-67, RT 6/13/12, 42:22-43:13). Witnesses Payne, J.K. Gray, and Arthur Maiden (along with Mr. Hardiman's witness Marquis Edwards) all testified about their activities, their own internal rules, their own membership requirements.

Payne testified that "shootings" were his own decision and not at the instruction nor required by any one of the PBB gang. (ER Vol. I, 68-74, RT 6/13/12 140:23-141:16; 145:20-146:5; 147:21-149:2). Arthur Maiden testified that he engaged in violence because he *believed* it would help his reputation but that he never received any increased status as a result of his violent acts. (ER Vol. II, 84-85, RT 6/18/12 21:16-22:9).

The government presented no evidence to establish the existence of a "enterprise" separate and apart from the criminal acts the government contributes to the individual gang members. Throughout the trial, the government presented merely specific instances of individual conduct without evidence to support the conclusion that these individuals were working on behalf of for the for the benefit of the "enterprise" itself or any of its leadership.

35

Edwards testified that there was no real leadership structure in the gang–everyone did whatever they chose to do for their own benefit. No one instructed others to commit crimes or shoot anyone. (ER Vol. II, 108-109, RT 7/3/12 43:4-44:24).

The evidence demonstrated a lack of structure, a lack of agreement by the general membership of the Pueblo Bishop Bloods gang. Each member was essentially on his own working for himself. The government's evidence of any gang structure was limited to the sub-gang of the Pueblo Bishop Bloods, namely the 54th Street clique.

In addition, the evidence adduced at trial failed to show that Mr. Hardiman was part of any conspiracy to engage in racketeering activities as part of the PBB "enterprise." (ER Vol. II, 107, RT 7/3/12, 31:1-14). The government's evidence failed to show that any of Mr. Hardiman's conduct was for the benefit of the enterprise or at its direction. The government's evidence demonstrated that Mr. Hardiman was not part of any leadership or management that had operational control or influence over the enterprise. To the contrary, Mr. Hardiman was not respected and, in some cases, despised by the other gang members precisely because he did not contribute to the gang.

The only reasonable inference for the Pueblo Bishop Bloods overall considering the evidence in a light most favorable to the government, is that the the PBB was a loosely affiliated group of individuals committing crimes for their own benefit. The evidence did not establish that the contemplated "enterprise" was distinct from the pattern of racketeering itself.

### 2. Similarly, The Government's Evidence Failed To Establish The Nexus Between Mr. Hardiman's Drug Sales And The Alleged RICO Conspiracy.

The evidence of Mr. Hardiman's drug sales consisted primarily of the video surveillance from an informant, CW4. The video depicts Mr. Hardiman in several drug transactions with CW4 in the residence of individuals who lived within the Pueblo del Rio housing project but who the government conceded were not members of the PBB or any sub-gang in the housing project.

The other evidence of Mr. Hardiman's drug trafficking involved co-defendant Stephen Patterson. However, that transaction showed that the transaction was Mr. Hardiman's alone. In fact, Patterson testified that he did not see Mr. Hardiman give the CW anything nor did he see the CW give Mr. Hardiman any money. All Patterson testified to was that Mr. Hardiman *told* him he had received $1,400.00. (ER Vol. II, 92-93, RT 6/28/12, at 103:21-104:4).

The evidence relating to Mr. Hardiman's drug trafficking at most demonstrates that Mr. Hardiman was involved in a separate uncharged conspiracy with  individuals other than the PBB members.

37

### B. The Jury's Special Verdict Finding Of The Quantity Of Crack Cocaine Was Not Supported By The Evidence.

While the government paraded cooperating witnesses who testified about the PBB members engaging in multiple drug transactions every day, the only specific evidence of the type and quantity of drugs in which Mr. Hardiman was involved came from the controlled purchases by confidential informants. Again, most of these transactions did not involve PBB members. Rather, they were facilitated by non-PBB members.

The additional evidence came from the controlled purchase involving Stephen Patterson. The evidence relating to the June 4, 2008 controlled buy included testimony by Special Agent Strickland, cooperator Stephen Patterson, and forensic chemists Daniel Roesch and Sylvia Tarin. Of particular note was exhibit 161, the cocaine recovered from the CW from the June 4, 2008 Patterson transaction.

Patterson had identified the drugs as simply "cocaine." The forensic analysis of Exhibit 161 initially showed it to be cocaine hydrochloride–powder cocaine. Chemist Sylvia Tarin testified that when the exhibit was tested initially in 2012, it revealed cocaine hydrochloride with sodium bicarbonate detected. By the time Ms. Tarin tested the exhibit for trial in 2012, it was entirely cocaine base. She explained that the cocaine hydrochloride converted into cocaine base over time:

> Q:    Now, if cocaine hydrochloride is --  comes into the presence and contact with cocaine base, over a period of time will there be a chemical reaction?

38

A:      In this case there was.

Q:      So in this case what happened?

A:      The other chemist had also detected the presence of sodium bicarbonate, and being in the presence of sodium bicarbonate over time it had cleaved off the hydrochloride and created the base form.

Q:      So am I correct that when Mr. Goldberg did his analysis, there was the presence of sodium bicarbonate separate from the cocaine hydrochloride?

A:      No. In the mixture, in the white powder itself --  it was just one big lump of powder --  detected the sodium bicarbonate as well.

Q:      All right. So to be clear, if you have sodium bicarbonate that comes into contact with cocaine hydrochloride, over time the chemical reaction will still occur without the dissolving process and heating that you described.

A:      Yes.

(ER Vol. II, 99-100, RT 6/28/12, 183:19-184:13).

It was this four year time span that resulted in the chemical change from cocaine hydrochloride to the 42.6 grams of cocaine base. At the time of the transaction, the substance was powder cocaine.

The evidence the government presented at trial does not support the jury's finding that the government proved beyond a reasonable doubt that Mr. Hardiman was responsible for over 28 grams of cocaine base as part of the drug trafficking conspiracy charged in Count 5.

39

### III. The District Court Made Sentencing Errors Requiring Remand.

### A. Guideline Enhancement Errors

The burden to prove the facts underlying a sentence enhancement rests with the government. *See United States v. Zolp*, 479 F.3d 715, 718 (9th Cir. 2007) (citing *United States v. Ameline*, 409 F.3d 1073, 1086 (9th Cir. 2005) (en banc)). Proof by a preponderance of the evidence generally suffices in finding evidence supporting a sentencing enhancement. *See United States v. Bonilla-Montenegro*, 331 F.3d 1047, 1049-50 (9th Cir. 2003) (citing *United States v. Jordan*, 256 F.3d 922, 927 (9th Cir. 2001)). But "when a sentencing factor has an extremely disproportionate effect on the sentence," due process requires that the government prove the underlying facts "by clear and convincing evidence." *Bonilla-Montenegro, supra* 331 F.3d at 1050 (citing *Jordan*, 256 F.3d at 927).

This Court reviews the district court's interpretation of the sentencing guidelines de novo, its application of the guidelines to the facts of the case for abuse of discretion, and its factual findings for clear error. *Zolp*, 479 F.3d at 718-19 (citing *United States v. Kimbrew*, 406 F.3d 1149, 1151 (9th Cir. 2005). The district court's evaluation of the reliability of evidence used at sentencing is reviewed for abuse of discretion. *See United States v. Alvarado-Martinez*, 556 F.3d 732, 735 (9th Cir. 2009) (citing *Roberts v. United States,* 445 U.S. 552, 556, 100 S.Ct. 1358, 63 L.Ed.2d 622 (1980)).

A material miscalculation in the advisory guideline range requires remand for resentencing.

40

> Even though *United States v. Booker* rendered the guidelines advisory, as part of its sentencing analysis under 18 U.S.C. § 3553(a), "the district court must calculate the guidelines range accurately. A misinterpretation of the guidelines by a district court effectively means that the district court has not properly consulted the guidelines" for purposes of its § 3553(a) analysis. *United States v. Mix*, 457 F.3d 906, 911 (9th Cir. 2006) (internal citations omitted). If the district court makes a material miscalculation in the advisory guidelines range, even after *Booker*, we must vacate the sentence and remand for resentencing. *United States v. Cantrell*, 433 F.3d 1269, 1280 (9th Cir. 2006).

*Zolp*, 479 F.3d at 721.

In determining drug quantities, especially where the district court makes an approximation, three criteria must be met. First, the government bears the burden of proving the quantity by a preponderance of the evidence. Second, the information on which such approximation is based must have "sufficient indicia of reliability to support its *probable* accuracy. And, third, because of the significance that the quantity determination has on the sentence calculation, "the district court must err on the side of caution in approximating the drug quantity." *See United States v. Forrester*, 616 F. 3d 929, 949 (9th Cir. 2010) (quoting *United States v. Kilby*, 443 F.3d 1335, 1141 (9th Cir. 2006)).

Furthermore, this Court has warned of the dangers inherent in applying the guidelines as a basis for punishment for unconvicted conduct:

41

> A guideline system that prescribes punishment for unconvicted
>
> conduct at the same level of severity as convicted conduct obliges
>
> courts to proceed carefully in determining whether the relevant
>
> conduct has been proven, even in cases in which the issue is only
>
> what guideline level or range is applicable.

*United States v. Scheele*, 231 F.3d 492, 498 (9th Cir. 2000).

Moreover, even in light of the advisory nature of the guidelines, the appropriate burden when the government seeks to enhance the guideline range based on relevant conduct remains.

> This case presents the question whether *Booker* is "clearly
>
> irreconcilable" with our precedent dictating that in certain
>
> circumstances, "the Due Process Clause requires the application of a
>
> clear and convincing evidence standard when an enhancement based
>
> upon uncharged conduct has an extremely disproportionate effect on
>
> the length of a defendants sentence." We conclude that it is not.

*United States v. Staten*, 466 F.3d 708, 718 (9th Cir. 2006) (quoting *United States v. Valensia*, 222 F.3d 1173, 1182 (9th Cir. 2000)).

In contrast to the offense level calculated by the PSR, the government argued for a substantially higher offense level based on speculation of the actual quantities of drug sales attributable to Mr. Hardiman. As an alternative argument, the government relied on the "relevant conduct" principles and vicarious liability theory

42

for imputing the increased drug quantity to Mr. Hardiman for purposes of the offense level calculation under U.S.S.G. § 1B1.3(a)(1)(B). (ER Vol. III, 141-51).[6]

    The district court accepted both of the government's propositions as a basis for attributing a higher drug quantity to Mr. Hardiman. It determined that the quantity was in excess of 280 grams of cocaine base relying primarily on testimony from government witnesses of the *frequency* of the sales, not the quantities involved.

> Even though the jury found that you were responsible for more than 28 grams but less than 280, the Government proved–I think–I disagree with the jury. I think the Government proved beyond any reasonable doubt that you were responsible for far more than that.

>     The Court concludes that you should be held responsible for conspiracy to traffic more than 280 grams of cocaine base based on direct evidence of your involvement and also vicarious liability as articulated by the Government in their brief. But just an an

---

[6] Application Note 2 to § 1B1.3(a)(1)(B) explains that "In the case of a jointly undertaken criminal activity, subsection (a)(1)(B) provides that a defendant is accountable for the conduct (acts and omissions) of others that was both: (A) in furtherance of the jointly undertaken criminal activity; and (B) reasonably foreseeable in connection with that criminal activity." In order to determine "relevant conduct," the Application Note warns that "the scope of the criminal activity jointly undertaken by the defendant (the "jointly undertaken criminal activity") is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant." *Id.* Accordingly, the district court must define "the scope of the criminal activity the particular defendant agreed to jointly undertake (i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement)." *Id.* It is the conduct of other participants that was "both in furtherance of, and reasonably foreseeable in connection with, the criminal activity jointly undertaken by the defendant" that constitutes "relevant conduct" under the guidelines. *Id.*

43

example, the confidential witness, or CW20, I think, testified clearly that between 2007 and 2010, you were involved in the sale of crack cocaine. your involvement involved the sale of crack cocaine approximately four to five time a day.

You were also involved in the sale and distribution of powder cocaine on large–in large quantities and the sale of heroin and also there's evidence of methamphetamine. But applying a very conservative number here, the Court is going to find that you are responsible for a number in excess of 280 grams of crack cocaine.

(ER Vol. IV, 219-220, RT 4/8/13 at 42:20-43:14.)

However, the district court made no express finding of the "scope of the criminal activity jointly undertaken" in order to arrive at the conclusion that Mr. Hardiman should be responsible for not only his own drug sales but vicariously liable for the sales of other Pueblo Bishop members.

Moreover, the evidence to support the frequency of sales had little reliability on the quantity involved or the actual drug. While the district court stated that it was using a "very conservative" quantity, it still accepted the government's quantity and type of drug: in excess of 280 grams of cocaine base.

For example, in the government's sentencing position, much is made of the fact that Mr. Hardiman was conducting his drug sales with an unindicted individual named Patti. (ER Vol. III, 144-45). What the government failed to state was the extensive evidence at trial that Patti, and her friends and family members who helped facilitate Mr. Hardiman's drug sales to a confidential informant, was not a member of the PBB, was not indicted in this case, and was not alleged to have been

44

a member of the charged conspiracies. The government's argument relied entirely on the premise that *all* Mr. Hardiman's drug trafficking activities were in furtherance of the charged conspiracies.

Accordingly, the government failed to establish that Mr. Hardiman should be held accountable for any quantity beyond that found by the jury.

## B. The District Court Sentence Of 188 Months Was Procedurally And Substantively Unreasonable.

This Court reviews the sentence imposed for "reasonableness," and this review consists of two parts. First, the Court must determine whether the sentence involved "significant procedural error." *United States v. Carty*, 520 F.3d 984, 993 (9th Cir. 2008) (en banc). Procedural sentencing errors include miscalculating the guidelines range; failing to give sufficient weight to the § 3553(a) factors; choosing a sentence based on clearly erroneous facts; or explaining a sentence inadequately. *Id.* at 993.

This Court reviews the district court's interpretation of the Guidelines de novo and its factual findings for clear error. *See United States v. Laurienti*, 611 F.3d 530, 551-52 (9th Cir. 2010). If there is no procedural error in the sentencing decision, only then does this Court move to the second part and review for "substantive" reasonableness. *See Carty*, 520 F.3d at 993. This Court then considers the totality of the circumstances with no presumption that a Guideline based sentence is reasonable. *See id.* The sentence may be reversed if the reviewing Court determines that "the district court committed a clear error of judgment in the conclusion it

45

reached upon weighing the relevant factors." *United States v. Amezcua-Vasquez*, 567 F.3d 1050, 1055 (9th Cir. 2009).

Substantive reasonableness requires that the sentence imposed comport with the parsimony mandate of § 3553(a) that the sentence should be "sufficient but not greater than necessary" to accomplish the goals of sentencing. S*ee United States v. Crowe*, 563 F.3d 969, 977 n.16 (9th Cir. 2009). A sentence is unreasonable, and must be reversed, if it gives too much weight to one § 3553(a) factor and not enough to the others. *See, e.g., United States v. Paul*, 561 F.3d 970, 974-75 (9th Cir. 2009).

As set forth fully above, the district court's sentence was based on two primary factors, both of which go to the seriousness of the offense: the estimated quantity of drug sales that should be attributed to Mr. Hardiman and the extent to which he was involved with guns. Most notably absent is the district court's analysis of Mr. Hardiman's argument that his sentence constitutes an unwarranted disparity in light of more culpable co-defendants receiving lower sentences.

Procedurally, the district court's erred in calculating the guideline offense level in its determination of the drug quantity was based on unreliable information as to the drug type and quantity. In addition, the sentence imposed did not consider all the § 3553(a) factors equally but focused primarily on the severity of the offense conduct.

Substantively, a sentence of 188 months is greater than necessary to achieve the goals of sentencing. The substantive basis for the 188 month sentence was again the nature and circumstances of the offense. The district court focused on the severity of Mr. Hardiman's conduct (the drug sales and weapons possession as well as

the robberies attributed to him). The sentence imposed was not necessary to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment." 18 U.S.C. § 3553(a)(2)(B).[7] And when compared with the 168 month sentence of the leader of the gang, Mr. Hardiman's sentence is exemplary of an unwarranted disparity in sentencing.

## C. The 10-year Supervised Release Term Exceeded The Maximum Allowed By Statute.

Finally, the district court erred in imposing a 10-year term of supervised release on Count 5 (21 U.S.C. §846, 841(a)(1) & (b)(1)(B)). The statute expressly provides that a minimum 4-year term shall be imposed unless the government has proven a prior conviction, in which case the minimum supervised release term is to be 8 years. Under subsection (b)(1)(A), (which would have applied had the jury found Mr. Hardiman responsible for over 280 grams of cocaine base), there is a 10-year term of supervised release. However, under the subsection that is the basis of Mr. Hardiman's conviction for Count 5, both 21 U.S.C. §841(b)(1)(B) and 18 U.S.C. § 3583 (b)(1) provide a maximum term of supervised release of only 5 years.

---

[7] Notably, the Guidelines provide for equal or lower base offense levels for much more serious offenses: kidnapping-level 32 (see U.S.S.G. § 2A4.1(a)); voluntary manslaughter-level 29 (see U.S.S.G. § 2A1.3(a)); sexual exploitation of a minor-level 32 (see U.S.S.G. § 2G2.1(a)).

47

# CONCLUSION

The Court should reverse Mr. Hardiman's conviction on Count 1 finding that the district court should have granted Mr. Hardiman's Motion to Dismiss. The Court should also reverse the conviction on Counts 1 and 5 based on insufficiency of the government's evidence to sustain the jury's verdict. The Court should also vacate the jury's special verdict finding that Mr. Hardiman was responsible for at least 28 grams of cocaine base, and remand the case for resentencing.

Finally, the Court should vacate Mr. Hardiman's sentence because of the procedural and substantive unreasonableness of the sentence and remand for resentencing. Because "there was a failure of proof after a full inquiry into the factual questions at issue" on appeal, this Court should limit resentencing to the existing record. *United States v. Espinoza-Morales*, 621 F.3d 1141, 1152 (9th Cir. 2010) (quoting *United States v. Matthews*, 278 F.3d 880, 885-886 (9th Cir. 2002) (en banc)).

Respectfully submitted,

October 9, 2013

David J.P. Kaloyanides

Attorney for Appellant-Defendant

Jermaine Hardiman

48

# CERTIFICATE OF RELATED CASES

Counsel for appellant-defendant is aware of the following cases arising out of the same events and charges:

United States v. Gary White, CCA 12-50589

United States v. Anthony Gabourel, CCA 13-50183

United States v. Jason Davis, CCA 13-50368

United States v. Marquis Edwards, CCA 13-50130

United States v. Lee Henderson, CCA 13-50374

United States v. Darrin Dent, CCA 11-50548

United States v. Steven Renell Williams, Jr., CCA 12-50537

United States v. Robbionta Monson, CCA 12-50180

United States v. Leo Rickey Evans, CCA 11-50463

Counsel for appellant certifies that this list is the extent of his knowledge, after reasonable and diligent inquiry, of any pending or prior cases presenting issues related to those raised in this brief.

October 9, 2013

David J.P. Kaloyanides

Attorney for Appellant-Defendant

Jermaine Hardiman

49

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and Circuit Rule 32-1, I certify that this brief is proportionally spaced, has a typeface of 14 points or more, and contains 12,070 words, not including the Table of Content, Table of Authorities, or this Certificate of Compliance, as calculated by my word processing program.

October 9, 2013

David J.P. Kaloyanides

Attorney for Appellant-Defendant

Jermaine Hardiman

## CERTIFICATE OF SERVICE

I hereby certify that on this day, October 9th, 2013, I electronically filed the foregoing APPELLANT'S OPENING BRIEF and APPELLANT'S EXCERPTS OF RECORD with the Clerk of the Court for the United States Court of Appeals for the Ninth circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Executed this 9th day of October, 2013, at Chino, California.

David J.P. Kaloyanides